IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HOWARD FARMER, JR., | : | CIVIL ACTION NO. |
| | : | 1:17-CV-2579-TWT-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMISSIONER,   SOCIAL | : | **FINAL      REPORT      AND** |
| SECURITY ADMINISTRATION, | : | **RECOMMENDATION   ON   AN** |
| | : | **APPEAL    FROM    A    SOCIAL** |
| Defendant. | : | **SECURITY DISABILITY ACTION** |

Plaintiff Howard Farmer, Jr. ("Plaintiff" or "Claimant") is a 59-year-old male

seeking Social Security Disability Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act ("the Act"). Plaintiff brings this action

pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the

Commissioner of the Social Security Administration (the "Commissioner"),[1] which

denied Plaintiff's claim for benefits. Plaintiff alleges disability and entitlement to

benefits on the basis of the severe impairments of borderline intellectual functioning

and bipolar disorder.

---

[1] Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017. However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345, *et seq*. Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Because Ms. Berryhill is no longer the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by official title rather than by name.

Plaintiff filed an application for DIB on March 10, 2010, and an application for SSI on August 17, 2010, alleging an onset date of disability of August 1, 2007. Record (hereinafter "R.") at 327–36. After the Commissioner's staff initially denied the applications, and denied Plaintiff's request for reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and ALJ Edgar J. Perkerson held a hearing on July 30, 2013. R. at 62–81, 145–52, 160–67. On September 23, 2013, ALJ Perkerson found that Plaintiff was not disabled as defined by the Act. R. at 123–39. On July 30, 2015, the Appeals Council of the Social Security Administration granted Plaintiff's Request for Review, vacated the decision of the ALJ, and remanded for a new hearing and decision. R. at 140–44.

After the Appeals Council's remand, ALJ Perkerson held a hearing on October 6, 2016. R. at 87–112. On December 13, 2016, ALJ Perkerson again found that Plaintiff was not disabled as defined by the Act. R. at 8–32. On February 21, 2017, the Appeals Council denied Plaintiff's Request for Review, making the ALJ's decision final. R. at 1–7.

The action is now before the undersigned and is ripe for review pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, based on the administrative record and the briefs of the parties, the undersigned **RECOMMENDS** that the that the final decision of the Commissioner be **REVERSED AND REMANDED**.

## I.    STANDARD FOR DETERMINING DISABILITY

An individual is "disabled" for purposes of disability benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Any impairments must result from anatomical, psychological, or physiological abnormalities demonstrated by medically accepted clinical or laboratory diagnostic techniques, and must prevent the claimant from substantial gainful work. 42 U.S.C. §§ 423(d)(2)–(3).

Claimant and the Commissioner share the burden of proof. Claimant bears the initial burden of establishing a "disability" by demonstrating that he cannot perform his former type of work. Once Claimant has met this burden, the burden shifts to the Commissioner to show that, considering the claimant's age, education, work experience and impairment, the claimant can perform other jobs. Claimant bears the ultimate burden to prove that he cannot engage in any substantial gainful activity. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

The Commissioner must use a five-step sequential analysis:

(1)    Is Claimant currently working? If so, the claim is denied.

(2)     Is the claimed impairment severe; that is, does the impairment or combination of impairments significantly limit the individual's physical or mental ability to do basic work activities? If not, the claim is denied.

(3)     Does the impairment equal or exceed in severity certain impairments described in the impairment listings in the regulations? if so, Claimant is automatically entitled to disability benefits.

(4)     Does Claimant have sufficient residual functional capacity to perform past work? If so, the claim is denied.

(5)     Considering Claimant's age, education, work experience, and residual functional capacity, can Claimant perform any other gainful and substantial work? If so, the claim is denied.

*See* 20 C.F.R. §§ 404.1520–404.1576, 416.920–416.976.

In this case, the Commissioner, adopting the findings of the ALJ, made the decision to deny disability benefits at Step 5, finding that, although Claimant is unable to perform his past relevant work as a tow truck driver, he retains the residual functional capacity to perform certain jobs that are available in significant numbers in the nationwide economy.

4

## II.    FINDINGS OF THE ALJ

The ALJ made the following findings of fact ("FOF"):

(1) The claimant meets the insured status requirements of the Social Security Act through September 30, 2012 . . . .

(2) The claimant has not engaged in substantial gainful activity since August 1, 2007, the alleged onset date . . . .

(3) The claimant has the following severe impairments: borderline intellectual functioning and bipolar disorder . . . .

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple instructions, and he should not work in close coordination with groups larger than six people . . . .

(6) The claimant is unable to perform any past relevant work . . . .

(7) The claimant was born on January 29, 1959, and was 48 years old, which is defined as a younger individual, on the alleged disability date. The claimant's age category changed to an individual closely approaching advanced age, as of the date last insured, and he is currently an individual of advanced age . . . .

(8) The claimant has a limited education and is able to communicate in English . . . .

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills . . . .

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .

(11) The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2007, through the date of this decision . . . .

R. at 15–25 (internal citations omitted).

## III.   SCOPE OF JUDICIAL REVIEW

This Court's review is limited. The Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. The Court may only determine whether substantial evidence supports the Commissioner's findings, and whether he applied proper legal standards. The Commissioner's findings are otherwise conclusive. *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

Substantial evidence is more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, we must view the record as a whole, taking into account

evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). In contrast, the Court's review of the ALJ's application of legal principles is plenary. *Walker*, 826 F.2d at 999.

## IV.  DISCUSSION

Plaintiff asserts four claims of error. First, Plaintiff argues that the ALJ failed to follow the instructions stated in the Appeals Council's July 30, 2015 remand order in determining Plaintiff's mental residual functional capacity ("RFC"). *See* Pl. Br. [11] at 12. Second, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's physical RFC by not taking into account Plaintiff's non-severe impairments. *See id.* at 17. Third, Plaintiff contends that the ALJ erred at Step 3 by not adequately evaluating whether Plaintiff met Listing 12.05(C). *See id.* at 18. Fourth, Plaintiff asserts that the ALJ erred in giving great weight to the medical opinions of two state agency reviewing consultants, in assessing Plaintiff's RFC.

For the reasons discussed below, the Court does not agree with Plaintiff's second, third, and fourth claims of error, but finds that the ALJ did not follow the Appeals Council's instructions in determining Plaintiff's mental RFC, and therefore

recommends that this action be reversed and remanded to the Commissioner based on Plaintiff's first claim of error.

A.   *Compliance with the Appeals Council's Remand Order*

The regulations provide that, on remand from the Appeals Council, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b), 416.977(b). An ALJ's failure to follow an order of the Appeals Council is a reversible error of law. *See Brooks v. Astrue*, No. 1:09-cv-24589-JFK, 2010 WL 3491230, at *9 (N.D. Ga. Aug. 30, 2010) (King, M.J.); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1376 (N.D. Ga. 2006) (Story, J.). The Eleventh Circuit has stated that, while in general, review of the Commissioner's decision is limited to whether substantial evidence supports the decision and whether the correct legal standards were applied, review of whether a court complied with a mandate is an issue of law reviewed *de novo*, and compliance with a mandate must be "strict." *See Apone v. Comm'r Soc. Sec. Admin.*, 435 F. App'x 864, 865, 865 n.4 (11th Cir. 2011). The Appeals Council's statements must be read in context of the entirety of its order; thus, and the ALJ must comply with a mandate to consider additional points if such a mandate is clear from the context of the Appeals Council's entire order. *See*

8

*Fincher v. Astrue*, No. 5:06-CV-336 (CAR), 2008 WL 821855, at *2 (M.D. Ga. Mar. 25, 2008) (citing *Tauber*, 438 F. Supp. 2d at 1375).

In this case, ALJ Perkerson made the following RFC finding in his first decision, on September 23, 2013:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is able to understand, remember, and carry out simple instructions; is able to interact appropriately with the public; is more than slight [sic] limited in his ability to interact with supervisors and coworkers, but can function satisfactorily; and is more than slightly limited in his ability to respond appropriately to usual work situations, but can still function well.

R. at 131. The ALJ found Plaintiff had "mild" restriction in activities of daily living, "moderate" difficulties in social functioning, and "moderate" difficulties in concentration, persistence or pace. R. at 130. The ALJ based these findings primarily on four items of record evidence: Plaintiff's hearing testimony on July 30, 2013, *see* R. at 62–81; a treatment record from the DeKalb Community Service Board ("DCSB") from July 2010 in which Plaintiff sought treatment for depression; the May 2010 opinion of consultative examining physician Dr. Tiffany Lee, M.D.; and, in the greatest detail, the March 2012 opinion of consultative psychological evaluator Dr. Elaine Zitomer, Ph.D. *See* R. at 132.[2] The ALJ noted that Dr. Zitomer

---

[2] The ALJ briefly mentioned that he gave "some" weight to certain other opinions of state agency medical consultants, but did not elaborate other than to state that the

found Plaintiff's "affect" to be "slightly hypomanic" and that Dr. Zitomer found "most notable" about Plaintiff's symptoms were his "poor interpersonal functioning, social withdrawal and preoccupation with feelings of inadequacy and failure." R. at 132 (citing R. at 652). The ALJ gave Dr. Zitomer's opinion "some weight" due to her "detailed examination" of Plaintiff but found that Dr. Zitomer's opinion was predicated on an assumption that Plaintiff had depression that had increased, which the ALJ found unsupported by the record evidence showing "only one session of treatment for Plaintiff's allegedly disabling mental impairments." R. at 132. The ALJ ultimately found that Plaintiff was not disabled. R. at 134.

On July 30, 2015, the Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ. R. at 142–43. The Appeals Council stated that the record was not clear regarding the nature and severity of Plaintiff's mental impairments or the limitations they caused on his ability to perform work-related activities. R. at 142. The Appeals Council noted that ALJ Perkerson had found Plaintiff to have the severe impairments of bipolar disorder and borderline intellectual functioning, and had found that these caused mild restrictions in activities of daily living, moderate difficulties in the ability to maintain social functioning, and moderate deficiencies of concentration, persistence or pace; but

---

consultants did not have the benefit of some of the "later-submitted" evidence. R. at 132.

according to the Appeals Council, "corresponding limitations are not adequately reflected in the claimant's . . . RFC." R. at 142.

The Appeals Council provided the following detailed instructions for the ALJ on remand:

- Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).

- Give further consideration to the claimant's maximum residual functional capacity and **provide appropriate rationale with specific references to evidence of record in support of the assessed limitations** (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p). In assessing the claimant's RFC, the ALJ will:

  1. **Cite to any specific evidence** that supports the mental aspect of the RFC finding. In particular, the ALJ should **point to any medical source opinions or other medical evidence supporting the assessment of the claimant's mental restrictions**.

  2. **Explain how he or she determined what mental restrictions to include in the RFC**. A complete explanation is especially important, if no specific evidence can be referenced to support the ALJ's conclusions.

  3. Consider whether to include in the RFC, restrictions that correlate to problems with social functioning or concentration, persistence, or pace. The ALJ can include such restrictions such as simple, routine, repetitive or unskilled work or other limitations in the RFC **but the reasons and bases for inclusion must be explained**. The ALJ should keep in mind that according to Social Security Ruling 85-15, the basic mental demands of competitive, unskilled work include the abilities to

(on a sustained basis) understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations, and deal with changes in a routine work setting.

R. at 143 (emphasis added). The Appeals Council also instructed the ALJ to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. R. at 143.

On remand, the ALJ held a hearing on October 6, 2016 at which a vocational expert testified, and Plaintiff was represented by counsel. *See* R. at 87. The ALJ then issued a decision on December 16, 2016 again finding that Plaintiff was not disabled. *See* R. at 25. In his discussion of whether Plaintiff's impairments met any of the listings, at Step 3, the ALJ discussed the severity of the limitations caused by Plaintiff's mental impairments. R. at 18. The ALJ found Plaintiff to have a mild restriction in activities of daily living, noting that Plaintiff told Dr. Zitomer that he had no problems attending to his own personal care, and that he could prepare simple foods, wash dishes, vacuum, do laundry, drive a car, use public transportation, and shop for groceries. R. at 18. The ALJ further noted that treatment records do not indicate any difficulties with daily activities, and Plaintiff's 2016 testimony also indicated he could prepare meals, drive, do light chores, and manage personal hygiene. R. at 18.

In the area of social functioning, the ALJ found Plaintiff to have moderate difficulties. R. at 18. The ALJ noted that Plaintiff described difficulties in getting along with others on three occasions: the March 2012 consultative psychological examination; an August 2016 mental health visit, and the October 2016 hearing. R. at 18. On the other hand, the ALJ noted that in a function report Plaintiff denied having problems getting along with others. *See* R. at 18 (citing R. at 492).

In concentration, persistence or pace, the ALJ found Plaintiff to have mild difficulties. R. at 18. The ALJ stated that Plaintiff reported in a function report that he could not pay attention for very long, and the consultative examiner who saw him in March 2012 reported his immediate attention to be below average and his concentration to be poor. The ALJ found there was no evidence of any "ongoing" limitations, however, and noted that Plaintiff reported that he drove children for his wife's daycare business, an activity requiring more than minimal concentration, persistence, or pace. R. at 19.

The ALJ's RFC finding, stated in his fifth FOF, was as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple instructions, and **he should not work in close coordination with groups larger than six people** . . . .

R. at 19 (emphasis added). With respect to the mental aspects of the RFC, the ALJ noted that Plaintiff testified that he had difficulty focusing, understanding, and getting along with his daughter, and that he had mood swings; the ALJ stated, however, that there was "no evidence to corroborate" these statements. R. at 20. The ALJ found that the evidence of record showed that the claimant had sought only minimal treatment for his bipolar disorder—essentially just one medical visit in July 2010 and a second in August 2016. *See* R. at 21 (citing R. at 619–28, 1005–08). Although the ALJ stated that the records from Plaintiff's treatment in August 2016 stated that Plaintiff had no depressive and anxiety symptoms, the ALJ stated that he "gave the claimant the benefit of all doubt in finding the claimant's reported bipolar disorder is a severe impairment that causes moderate limitations in social functioning." R. at 21.

Next, as he had done in his 2013 decision, the ALJ discussed Plaintiff's March 2012 consultative psychological evaluation with Dr. Zitomer. After repeating some of the findings he had previously described in his 2013 decision, the ALJ added that Dr. Zitomer assessed Plaintiff with an IQ score of 70. R. at 21. Still, the ALJ stated that Dr. Zitomer's evaluation suggested no significant limitations in Plaintiff's

ability to understand, remember, and carry out simple instructions, and found that "there is no evidence to support finding any adaptive functioning deficits." R. at 21.[3]

The ALJ noted several reasons why he believed Plaintiff did not have significant issues with understanding and concentration. According to the ALJ, treatment records post-dating the March 2012 psychological evaluation did not suggest any problems in understanding treatment recommendations or medication dosages. R. at 21. Plaintiff testified that he had engaged in occasional work that included the transportation of children—the ALJ explained that driving requires a number of mental and physical skills such as focus and concentration, and found Plaintiff's subjective testimony of problems in those mental abilities to be inconsistent with the evidence of record. R. at 22.

As he had done in 2013, the ALJ assigned "some" weight to Dr. Zitomer's opinion, stating that while she had given a "detailed" examination of Plaintiff, her assessments were inconsistent with the "limited treatment evidence" from DCSB and that there was no evidence Plaintiff had depression that had increased, as Dr. Zitomer appeared to assume. R. at 22. The ALJ found that Plaintiff's lack of any significant mental health treatment, and Plaintiff's apparent ability to work,

---

[3] As discussed below with regard to the third claim of error, the ALJ then indicated there was "no evidence to suggest the claimant's diminished cognitive functioning should be evaluated under listing 12.05." R. at 21.

indicated Plaintiff had no more than mild limitations in daily activities and concentration, persistence, or pace. R. at 22. Still, the ALJ stated:

> Nevertheless, the undersigned gave the claimant the benefit of the doubt in finding that he is moderately limited in social functioning. The determined residual functional capacity accommodates any potential limitations the claimant may experience as the result of his mental impairments.

R. at 22. The ALJ assigned "some weight" to a medical source statement completed in September 2016 by a mental health provider but noted the majority of the statement was not completed because of a lack of longitudinal treatment history. R. at 22. He assigned "little weight" to the opinion of Dr. Lee, finding that her assessment of limitations in Plaintiff's walking abilities were unsupported by the record. R. at 22. Unlike in his first decision in which he assigned them "some weight," the ALJ gave "great weight" to the opinions of two state agency reviewing physicians. R. at 22. With respect to these opinions' assessment of mental capacities, the ALJ stated that their finding of "insufficient evidence to determine the claimant's mental impairments" was "also not inconsistent with the dearth of mental health treatment records." R. at 23.

Plaintiff advances two arguments for why the ALJ failed to follow the Appeals Council's remand order. First, Plaintiff states that the ALJ "downgrad[ed]" Plaintiff's limitations in maintaining concentration, persistence or pace from

"moderate" in the first decision to "mild" in the second decision. *See* Pl. Br. [11] at 14. Plaintiff asserts that the ALJ's only justifications for this change—that there was little to no evidence documenting ongoing limitations with concentration and that Plaintiff testified to driving for his wife's daycare business, which requires concentration—was an erroneous approach of "picking and choosing" the evidence. *See id.* at 14–15.

Second, Plaintiff argues that the ALJ's finding that Plaintiff had limits in his ability to be able to understand, remember, and carry out simple instructions, and should not work in close coordination with groups larger than six people, was error for two reasons. *See id.* at 15. The ALJ "deleted," according to Plaintiff, his previous findings that Plaintiff was limited in his abilities to interact appropriately with the public, supervisors, and coworkers, and to respond appropriately to usual work situations, without any elucidation of a reason for this deletion; Plaintiff contends that the ALJ failed to explain why he did not maintain these limitations given some of Dr. Zitomer's findings such as that Plaintiff had "poor interpersonal functioning." *See id.* at 15. Second, Plaintiff argues that the ALJ provided no explanation for how he translated his finding that Plaintiff had "moderate" limitations in social functioning into the sole limitation that Plaintiff could not work in close coordination with groups larger than six people. *See id.* at 15.

17

Defendant argues that the ALJ did comply with the remand order. Defendant states that the ALJ obtained updated medical evidence, held a supplementary hearing with the testimony of a vocational expert, and made an RFC finding that is supported by substantial evidence in the record. *See* Def. Br. at 7–8. Defendant states that the ALJ properly translated his finding that Plaintiff had moderate limitations in social functioning into findings that Plaintiff had limitations in his ability to understand, remember, and carry out simple instructions and to not work in close coordination with groups larger than six people, and that the record evidence supports no finding of greater limitations. *See id.* at 8. Defendant argues that the ALJ's finding is supported by substantial evidence because Plaintiff drove children for his wife's business; because Plaintiff sought infrequent treatment for his bipolar disorder and his treating sources did not note additional restrictions; and because the medical source report from September 2016 stated that Plaintiff had bipolar disorder but with "absent symptoms." *See id.* (citing R. at 1005–08).

The record evidence pertinent to Plaintiff's mental RFC reveals that Plaintiff was examined by consultative examining physician Dr. Tiffany Lee, MD on May 12, 2010. R. at 611. Dr. Lee noted that Plaintiff reported being diagnosed with bipolar disorder in 2009 but that he denied suicidal/homicidal ideations and also denied auditory and visual hallucinations. R. at 611. Dr. Lee stated that with respect

to mental status, Plaintiff appeared alert and oriented but did not appear depressed or anxious, and there was "no evidence of problems with memory." R. at 613. Dr. Lee's "functional restrictions" statement noted that Plaintiff had "diagnosed himself" with bipolar disorder, and Dr. Lee advised Plaintiff "to follow up with a mental health clinic for a complete evaluation and treatment plan, if indicated." R. at 613.

On June 16, 2010, Dr. John Hassinger, MD provided a "case analysis" of Plaintiff's file, but this document does not contain any mental health-related findings. R. at 618. A third reviewer, Hector Manlapas, provided a similar "case analysis" on April 4, 2011 that does not assess mental health and does not appear to have evaluated the records discussed immediately below from Plaintiff's treatment at DCSB. *See* R. at 643.

Plaintiff sought treatment for chronic depression "that has recently increased, due in part to conflict/separation from wife" at DCSB on July 15, 2010. R. at 621. Plaintiff was seen by Margaret A. Redus, LCSW, who noted that Plaintiff had certain symptoms including low self-esteem, "SI [suicidal ideation] without plan," and that he "seems to be fighting to not feel hopeless" and "[a]ppears motivated to utilized treatment." R. at 621, 625. Plaintiff was scheduled for an "orientation session" five

days later, on July 20, 2010, which he attended and at which he was seen by Julie Cassady, CNS. R. at 622.

Cassady noted that Plaintiff was struggling with depression, lack of sleep, hopelessness, and thoughts of hurting himself or his wife, and that he had recently heard voices telling him to harm his wife. R. at 623. Plaintiff reported a history of hearing voices since age 23 but stated that he knew not to act on them. R. at 623. Plaintiff also reported a history of depression since age 23 as well as mood swings and occasional "manic" episodes of feeling good and engaging in risky behavior; and a period of alcohol abuse in his 30's. R. at 623. Plaintiff also reported that he had a history of suicidal ideation and had once shot himself in the hand to avoid shooting himself in the head. R. at 623. Plaintiff reported that he had never gotten treatment before. R. at 623. Ultimately, Cassady noted a diagnosis of bipolar affective disorder, mixed severe; as well as a diagnosis of "other suspected mental condition" labeled as "personality disorders/mental retardation." R. at 622. Redus, on July 15, 2010, also prepared a treatment plan that called for Plaintiff to participate in therapy or training over the following 90 days, and to transition to "MMCSI" once his treatment goals were met for 6 months. *See* R. at 627–28.[4]

---

[4] There is no evidence that Plaintiff was ever seen for any follow-up treatment called for by this treatment plan.

On March 30, 2011, state agency reviewing psychologist Dr. Shelby Gennet, Ph.D. completed a psychiatric review, but her form is predominantly blank and indicates "insufficient evidence." R. at 629–41. Dr. Gennet wrote the following explanatory note:

> 52 y.o male alleges bipolar problems and special education. Clmt failed to keep psych CE appt on 2/18/2011. No response to D1/D2 letters or telephone calls to clmt and third party. Insufficient evidence with which to make a decision on the claim.

R. at 641.

As noted above, on March 14, 2012, psychologist Dr. Elaine Zitomer, Ph.D. examined and evaluated Plaintiff and completed a medical source statement and psychological evaluation report. R. at 645–53. Plaintiff reported to Dr. Zitomer that he had attended special education classes in grade school. R. at 648. He said that he stopped receiving treatment at DeKalb Mental Health because he didn't want to bother any more. R. at 649. Plaintiff reported feelings of worthlessness, poor concentration and indecisiveness as well as suicidal ideation and hypomanic episodes every other day or week. R. at 649. Plaintiff reported being able to attend to his own personal care and prepare simple foods, but complained of poor memory and being easily distracted. R. at 649. He reported having only one friend. R. at 649.

Dr. Zitomer observed that Plaintiff was jovial, friendly, oriented, and cooperative. R. at 650. When asked certain questions or given certain tasks he

showed adequate memory but below average immediate attention, and poor concentration. R. at 650. As noted above Plaintiff's overall IQ was assessed to be 70. R. at 651. Dr. Zitomer diagnosed Plaintiff with Bipolar disorder, mixed, moderate severity. R. at 652. As stated above, she wrote that "What is more notable in his symptoms are his poor interpersonal functioning, social withdrawal and preoccupation with feelings of inadequacy and failure." R. at 652. She found that he was "capable of understanding and remembering simple and detailed instructions" and "capable of getting along with others most of the time, but has a tendency to get into conflicts." R. at 653. Furthermore, she found that Plaintiff "has a limited capacity to adapt to stress, and tends to be somewhat impulsive and to have increased suicidal feelings under conditions of increased emotional stress." R. at 653.

In Dr. Zitomer's medical source statement she found Plaintiff to have mild limitations in the abilities to understand and remember complex instructions, carry out complex instructions, and respond appropriately to usual work situations and to changes in a routine work setting." R. at 645–46. She found him to have moderate limitations in his abilities to make judgments on complex work-related decisions, and to interact appropriately with supervisors and coworkers. R. at 645–46. In a handwritten note, Dr. Zitomer added that Plaintiff had a "history of interpersonal difficulties in workplace." R. at 646.

The 2016 record that the ALJ discussed in his decision was completed on September 21, 2016 by Dr. Prem Kansal of Winn Way Clinic. R. at 1005–08. Dr. Kansal explained that this visit was the first time Dr. Kansal had seen Plaintiff, but that Plaintiff had been seen by the same clinic in 2010 and was diagnosed as suffering from bipolar illness. R. at 1008. Dr. Kansal wrote "unable to complete" above the question on the form that asked him to evaluate Plaintiff's functional limitations. R. at 1007. He also circled "absent" on each of 9 listed symptoms for depressive syndrome and 8 listed symptoms of manic syndrome. R. at 1005–06. Regarding bipolar syndrome Dr. Kansal wrote "see above [where Dr. Kansal circled "absent" for depressive and manic symptoms] and see last page [where Dr. Kansal noted that this was his first time seeing Plaintiff but that Plaintiff had been diagnosed as bipolar in 2010]." R. at 1006.

The record also contains a clinical report from DCSB dated August 23, 2016, completed by Tameka Harris-James, LCSW. R. at 999–1004. This document does not appear to contain any diagnoses, examination notes or medical opinions, but Harris-James did notate Plaintiff's self-described medical history. *See* R. at 1003. According to these notes, Plaintiff had a history of diagnosis of bipolar disorder and reported that he still experienced depression and anger, could not get along with people, and felt as though his life didn't really matter. R. at 1003. Plaintiff described

shooting himself in the hand in 1991. R. at 1003. He also claimed to have been "clean" for 5 years and to have been off alcohol for two years. R. at 1003.[5]

The Court does not agree with Plaintiff's arguments that the ALJ erred by "downgrading" or "deleting" certain limitational findings from his first decision. When the Appeals Council vacates an ALJ's first written decision and remands, the specific findings in the first decision are not conclusively established, and are subject to modification. *Gibbs v. Barnhart*, 130 F. App'x 426, 430 (11th Cir. 2005). Thus, on remand for redetermination, there is no issue preclusion. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). When the Appeals Council remands, the ALJ is not bound by his first decision. *Campbell v. Brown*, 822 F.2d 1518, 1522 (10th Cir. 1987). "To hold otherwise would discourage administrative law judges from reviewing the record on remand, checking initial findings of fact, and making corrections, if appropriate." *Id.* In this case, the ALJ's decisions were issued more than three years apart, and the ALJ was fully entitled to make new findings of fact without needing to explain why those findings differed from a previous, vacated

---

[5] Defendant, in its brief, criticizes this statement about being "clean" as inaccurate, because when Plaintiff presented to DeKalb Medical Center in early July 2013 with hypertension, he tested positive for cocaine and also admitted cocaine use. R. at 740–741; *see* Def. Br. at 4.

decision.[6] The Court accordingly rejects Plaintiff's arguments that are predicated on the assumption that the ALJ was required to explain his "changes" from his first decision to the second.

Nevertheless, while the ALJ was under no obligation to explain "changes" from the vacated 2013 decision, he was required to comply with the Appeals Council's detailed and specific 2015 remand order. The Court finds that the ALJ's approach fell short with respect to the portions of the remand order that concerned the ALJ's mental RFC assessment, because the ALJ did not explain his assessment that Plaintiff could not work closely with groups of six or more persons.

The Appeals Council ordered the ALJ to "point to any medical source opinions or other medical evidence supporting the assessment of the claimant's mental restrictions" and "Explain how he or she determined what mental restrictions to include in the RFC." R. at 143. The Court agrees with Plaintiff that the ALJ did not provide any explanation for the stated restriction that Plaintiff should not work

_____

[6] It is entirely logical, moreover, that the ALJ might have "downgraded" certain limitational findings (such as the change from "moderate" to "mild" in his assessment of Plaintiff's concentration, persistence, or pace) after the passage of three years between his decisions, if the evidence of record for the intervening period failed to show that Plaintiff had any ongoing problems in those abilities, and indeed affirmatively undermined the prior finding of a "moderate" restriction because the evidence showed Plaintiff engaged in activities (such as driving children) that required significant concentration.

in close coordination with groups larger than six people, and failed to identify medical opinions or evidence supporting that finding.

The ALJ's discussion indicates that this limitation is intended to account for the ALJ's finding that the Plaintiff has moderate limitations in social functioning. *See* R. at 22. That finding of social functioning limitations, in turn, appears to be partly based on the consultative opinion of Dr. Zitomer, as to whom the ALJ gave "some weight." *See* R. at 22. Dr. Zitomer opined that interpersonal relations was Plaintiff's greatest area of challenge and that although he usually can interact satisfactorily, he has a tendency to get into conflicts has a limited capacity to deal with stress. *See* R. at 653. Although the ALJ was critical of other aspects of Dr. Zitomer's opinion, particularly as to the conclusions vis-à-vis concentration, persistence and pace, the ALJ did not specifically criticize Dr. Zitomer's conclusions vis-à-vis social functioning, and to the contrary ultimately agreed that Plaintiff is moderately limited in that area.

While the ALJ appeared skeptical that Plaintiff did indeed have these limitations—the ALJ repeatedly stated he was giving Plaintiff the "benefit of the doubt" on this issue—once the ALJ found the existence of a moderate limitation on this point, the ALJ was required to actually incorporate that limitation by explaining what it did or did not preclude Plaintiff from doing, and why.

The ALJ purported to account for the social function limitation by limiting Plaintiff to working in groups of six or less. The ALJ failed, however, to explain this restriction or identify any medical evidence supporting it. As a result, in contravention of the remand order, the ALJ provided an entirely arbitrary limitational finding. Dr. Zitomer's statement, after all, was not that Plaintiff had trouble in large groups, but rather that he had a limited capacity to deal with stressful situations. There is no medical evidence discussed for how such a problem is managed by simply limiting the Plaintiff to dealing with six or fewer people. To be sure, certain workplace environments might become more stressful to the extent they require working in large groups, but it is equally possible for workplaces involving large groups to not be stressful, just as it is possible for workplaces involving small groups to be stressful. In any event, the ALJ did not explain the relevance of group size or tie it to anything in the record. In sum, not only does the ALJ's mental RFC finding therefore lack substantial evidence in support, but the ALJ violated the order of the Appeals Council to "explain how he or she determined what mental restrictions to include in the RFC." The Court therefore recommends that this action be remanded for a more adequate explanation of the limitational findings.

If this recommendation of the undersigned is adopted, it may be that the ALJ upon remand finds the Plaintiff even less limited in social functioning than he found

in his previous decisions—assuming substantial evidence supports such a finding and it is more adequately explained. In other words, the Court's finding that the ALJ erred in not explaining his findings will not necessarily bring Plaintiff any closer to an award of benefits. At this stage, however, the Court cannot evaluate whether the ALJ's inadequate explanation of the group-size limitation in Plaintiff's mental RFC was harmless error without "re-weighing the evidence and engaging in conjecture that invades the province of the ALJ." *See Nyberg v. Comm'r of Soc. Sec.*, 179 F. App'x 589, 592 (11th Cir. 2006) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005) (where ALJ failed to consider certain factors, and indicate their impact on the ultimate RFC conclusion, Court could not even evaluate whether that error was harmless)). Accordingly, remand is the appropriate remedy for the error described above.

B.     *Discussion of Non-Severe Impairments in RFC Finding*

Plaintiff's second claim of error is that, although the ALJ considered Plaintiff's non-severe physical ailments at Step Two (during the ALJ's discussion of which of Plaintiff's ailments were severe), the ALJ failed to discuss Plaintiff's non-severe ailments at Step Four when assessing Plaintiff's physical RFC. *See* Pl. Br. at 17. The Court finds that, quite simply, the ALJ did consider the non-severe

impairments at Step Four, and said so explicitly—the Court therefore finds this claim of error to be without merit.

In assessing a claimant's RFC, an ALJ must "consider the limiting effects of all . . . impairment(s), even those that are not severe." 20 C.F.R. §§ 404.1545(e), 416.945(e); *see also Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987) (reversal required because ALJ's RFC finding made no reference to claimant's self-reported complaints of arthralgias, phlebitis, hypertension, gastrointestinal problems and asthma, even though the ALJ did not find any of these to constitute severe limiting conditions). Thus, Plaintiff is correct that the ALJ was required to consider impairments that he found to be non-severe, in addition to those impairments found to be severe, in assessing Plaintiff's RFC.

In his decision, at Step Two, the ALJ provided a lengthy narrative discussion explaining why he did not find Plaintiff's hypertension, irregular heartbeat, diabetes, transient ischemic attack (TIA), arthritis, or obesity to be severe impairments. *See* R. at 15–18. The ALJ explained that there were a number of normal medical findings about Plaintiff's cardiac condition and that the record showed Plaintiff denied cardiac symptoms. R. at 15. According to the ALJ, Plaintiff did not comply with medication for hypertension and also denied symptoms that would be associated with that condition. R. at 16. Plaintiff's diabetes was found non-severe because

Plaintiff "has been noted to be healthy and well-nourished with no specific complications associated with his diabetes, and he has sought no more than routine, conservative treatment." R. at 16. The ALJ explained that there was no evidence the TIA Plaintiff was diagnosed with on one occasion had recurred or caused any residual limitations, and that at the time it happened Plaintiff had gone to work hoping to feel better, which was inconsistent with a severe condition. R. at 16.

With respect to arthritis, the ALJ explained that the medical evidence of record did not indicate a more than minimal effect on the ability to perform basic work related activities; furthermore, Plaintiff's physical examinations had all been within normal limits, including in his ability to ambulate. R. at 17. Finally, the ALJ acknowledged Plaintiff was obese, and that obesity is a condition that can exacerbate other conditions. However, according to the ALJ, the record showed an absence of any severe diagnoses, and Plaintiff had a physical examination within normal limits in November 2015 and his ability to ambulate was found to be within normal limits in 2016. R. at 17.

At Step Four, the ALJ determined that Plaintiff had the RFC to "perform a full range of work at all exertional levels," with limitations only in the mental capacities discussed above. R. at 19. Under his RFC finding, the ALJ specifically stated, "The undersigned addressed the claimant's non-severe physical impairments

above and incorporates such analysis herein by reference as needed." R. at 20. The ALJ also explained that, in addition to the considerations stated at Step Two for why Plaintiff's physical impairments were non-severe, Plaintiff testified that he drove a vehicle to transport children—an activity requiring "significant physical abilities such as sitting in one place for a period of time, turning the steering wheel, and maneuvering one's body in positions to see in all directions and angles, while simultaneously operating foot controls." R. at 22.

According to Plaintiff, the ALJ "effectively ignored" Plaintiff's non-severe physical impairments in determining Plaintiff's RFC. Plaintiff argues that the ALJ's discussion erroneously failed, for example, to account for Dr. Lee's opinion that Plaintiff should avoid activities that require distance walking. *See* Pl. Br. at 17.

The Court rejects this argument. Plaintiff does not acknowledge that the ALJ did incorporate his detailed and well-supported discussion from Step Two into his discussion of Plaintiff's RFC at Step Four. The ALJ's Step Two discussion explains in detail why Plaintiff's physical impairments were not severe enough to limit his ability to engage in work-related activities. Furthermore, the ALJ was not required to defer to one-time examining physician Dr. Lee's opinion as to Plaintiff's ability to walk. *See McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 117987) (medical opinions of one-time examining consultants not entitled to deference). The ALJ

31

provided a detailed explanation for why Plaintiff's arthritis and diabetes did not significantly limit his ability to walk, and noted findings in the record that show Plaintiff could ambulate normally. *See, e.g.,* R. at 991 (clinic notes dated May 6, 2016 advising Plaintiff to exercise 30 minutes per day 5 times per week). The ALJ's physical RFC assessment was both adequately explained and supported by substantial evidence.

C.    *Listing 12.05(C)*

Plaintiff argues in his third claim of error that the ALJ erred in declining to evaluate his eligibility for Listing 12.05(C). The Eleventh Circuit has explained the criteria for meeting this listing as follows:

> To meet listing 12.05 ("intellectual disability"), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton*, 120 F.3d at 1219. These requirements are referred to as the listing's "diagnostic criteria." See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description for [intellectual disability].") In addition to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing. *See id.* § 12.05. Under paragraph C, . . . a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.
>
> A valid IQ score of 60 to 70 satisfies the first prong of paragraph C and creates a rebuttable presumption that the claimant satisfies the diagnostic criteria for intellectual disability. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268–69 (11th Cir.2001). At the same time, it is well

established that such a presumption does not arise where a qualifying IQ score is inconsistent with other record evidence concerning her daily activities and behavior. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) (citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir.1986)). But once the ALJ accepts an IQ score as valid and finds that the claimant's impairments meet or medically equal the other criteria of listing 12.05(C), the disability determination cannot be based on the claimant's age, education, or work experience. *Id.*

In sum, a claimant proves that she meets listing 12.05(C) by establishing the diagnostic criteria for intellectual disability, including deficits in adaptive functioning; showing onset before age 22; producing a valid, qualifying IQ score; and exhibiting the requisite deficits in work-related functioning.

*Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910–11 (11th Cir. 2015).

The term "adaptive functioning" is not defined in the regulations, but as the Eleventh

Circuit has explained:

While . . . the Social Security Regulations do not define the term adaptive functioning, the Social Security Administration's Program Operations Manual System ("POMS") provides a definition for "adaptive functioning" in the disability context. *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (explaining that the POMS is an administrative interpretation, which, although not the product of formal rulemaking, has been promulgated by the Social Security Administration as "publicly available operating instructions for processing Social Security claims"). According to the POMS, adaptive functioning refers "to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." Soc. Sec. Admin., Program Operations Manual System, DI 24515.056(D)(2) (2012), [*available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056.]

*Schraeder v. Acting Comm'r of the Soc. Sec. Admin.*, 632 F. App'x 572, 576 (11th Cir. 2015); *see also id.* at 576 n.3 ("adaptive functioning refers 'to how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical.'") (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013)).

In this case, the ALJ found at Step Three that Plaintiff did not meet the criteria of any listing. *See* R. at 18–19. Under his FOF 4, the ALJ explained why Plaintiff did not meet Listings 12.02, 12.04, or 12.06. R. at 18–19. Later in the opinion, under his Step Four explanation of Plaintiff's mental RFC, the ALJ found that there was no evidence of "adaptive functioning deficits" that would justify evaluation of Plaintiff under Listing 12.05:

> . . . Dr. Zitomer administered several widely recognized and accepted tests to determine the claimant's level of cognitive functioning. (Exhibit 9F). Although the claimant achieved a full scare [sic] IQ score of 70, there is no evidence to support finding any adaptive functioning deficits (Exhibit 9F). The Claimant maintained substantial employment in a semiskilled occupation for many years and he was noted to be capable of living independently. Therefore, while a diagnosis of borderline intellectual functioning may be appropriate, there is no evidence to suggest the claimant's diminished cognitive functioning should be evaluated under listing 12.05. Particular consideration was given to the fact that the claimant also has no additional mental or physical

impairments that are exacerbated by his below average intellectual functioning.

R. at 21.

Plaintiff argues that the ALJ's approach was error because the ALJ did not evaluate Plaintiff's eligibility at Step *Three*, and because "Valid low IQ scores after the age of 22 create a presumption that the plaintiff had deficits in adaptive functioning manifested prior to age 22." *See* Pl. Br. at 21 (quoting *Castro v. Berryhill*, No. 3:15-cv-1396-J-MCR, 2017 WL 1050074, at *3 (M.D. Fla. Mar. 20, 2017). According to Plaintiff, the ALJ did not engage in the fact-specific analysis necessary to rebut this presumption based on evidence about Plaintiff's daily life. *See id.* Plaintiff argues that the fact that Plaintiff previously worked as a tow truck driver, or that he was capable of living independently (notwithstanding that he has lived with his wife and then his sister) do not necessarily preclude him from meeting the listing. *See id.* at 22. Plaintiff also faults the ALJ's finding that Plaintiff did not have a physical or mental impairment that "exacerbated" his below-average function; Plaintiff states that the listing merely requires that this impairment impose "an additional and significant work-related limitation of function" and does not have any requirement of "exacerbation." Pl. Br. at 23.

Defendant argues that the ALJ did not err in declining to evaluate Plaintiff for the listing. Defendant states that there is no diagnosis of mental retardation[7] in the record, and that Dr. Zitomer only diagnosed Plaintiff with "borderline intellectual functioning" (BIF). *See* Def. Br. at 12. Defendant also argues that the presumption that an IQ score raises about a claimant's adaptive functioning does not arise when the record evidence of the Plaintiff's daily activities and behavior is inconsistent with the Plaintiff meeting the diagnostic criteria. *See id.* at 11–12.

The Court finds that, contrary to Plaintiff's argument that his eligibility for Listing 12.05(C) was not evaluated, the ALJ did discuss this issue and explain why the evidence did not suggest eligibility for the listing. Among other things, the ALJ pointed out that there is no indication of significant deficits in adaptive functioning. Plaintiff is correct that a claimant who presents a valid IQ score between 60 and 70 inclusive, combined with evidence of a physical or other mental impairment imposing additional and significant work-related limitation of function, presumptively meets the diagnostic criteria (including the showing of deficits in adaptive functioning) under Listing 12.05(C). *See Lowery v. Sullivan*, 979 F.2d 835,

---

[7] The Court notes that the regulations have been amended to use the term "intellectual disability" rather than "mental retardation" because "the term 'mental retardation' has negative connotations" and "has become offensive to many people." *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed.Reg. 46,499, 46,501 (Aug. 1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1).

837 (11th Cir. 1992).[8]  In this case, Plaintiff has indeed shown both a valid[9] score of 70 and that he has an additional severe mental impairment: bipolar disorder. Still, a valid score is not conclusive of meeting the diagnostic criteria if it is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *Id.; see also Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986).

In this case, the ALJ's determination that Plaintiff did not meet the eligibility for the listing is supported by the consultative opinion of Dr. Zitomer, who stated that Plaintiff's adaptive functioning is "below average, but adequate for most tasks of daily living." R. at 653. Dr. Zitomer also noted that Plaintiff has held jobs including being a tow truck driver. This, in combination with Plaintiff's apparent ability to live independently, as the ALJ discussed throughout his decision, supports the ALJ's determination not to apply the listing. *See, e.g., Schraeder*, 632 F. App'x at 577 (substantial evidence supported the ALJ's finding that claimant did not meet

---

[8]  Defendant (who cites no authority for this proposition) is incorrect that a "diagnosis" of "mental retardation" is therefore required. The presumption may arise upon the showing of a qualifying IQ score plus the additional physical or mental impairment. Defendant appears to confuse the concepts of "diagnostic criteria" for the listing with a medical "diagnosis" of a condition.

[9]  The Eleventh Circuit has clarified that there is a presumption that intellectual disability is a condition that remains constant throughout life, and therefore a low IQ score achieved after age 22 creates the presumption that adaptive functioning deficits existed prior to that age as well. *See Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001).

criteria for listing 12.05(C) because claimant did not have requisite deficits in adaptive functioning). While Plaintiff may be correct that certain elements of his past work or activities of daily living that the ALJ considered do not necessarily *preclude* a finding that he meets Listing 12.05(C), those facts nevertheless constitute substantial evidence to support the ALJ's decision that he did not meet the listing. Under the substantial evidence standard of review, there is no basis to find error in the ALJ's approach.

On remand, however—while the Court finds that the ALJ's analysis was sufficient to explain Plaintiff's ineligibility for the listing[10]—the ALJ may wish to formally "evaluate" Plaintiff for Listing 12.05(C) as part of his Step Three discussion, rather than stating that there is no need for the evaluation, to avoid any doubts over whether the listing criteria were appropriately considered.

D.   *Weight of the Medical Opinions*

Plaintiff's final claim of error concerns the ALJ's assignment of "great weight" to the "opinions" of state agency reviewing consultants Dr. Hassinger and Dr. Gennet. *See* Pl. Br. at 24. According to Plaintiff, it was "obvious" error to assign this weight to the opinions of medical sources who "in fact expressed no opinions

---

[10] *See Flemming v. Comm'r of the Soc. Sec. Admin.*, 635 F. App'x 673, 676 (11th Cir. 2015) ("we may infer from the record that the ALJ implicitly considered and found that a claimant's disability did not meet a listing.") (citing *Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).

due to insufficient evidence." *See id.* Plaintiff cites an unpublished Eleventh Circuit case, *Davison v. Astrue*, 370 F. App'x 995, 997 (11th Cir. 2010) for the proposition that the opinion of a non-examining physician is entitled to little weight when it contradicts the opinion of an examining physician.

Plaintiff's argument under this claim of error is not articulated in any substantial depth,[11] and Plaintiff cites no authority for his argument that the ALJ's approach was "obvious" error. Still, the Court acknowledges that the Eleventh Circuit has stated that "no inference should be taken" from a physician's silence as to a claimant's restrictions. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Furthermore, the opinions of non-examining, reviewing physicians standing alone do not constitute substantial evidence. *See Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987). In this case, however, the ALJ did not base his decision solely on the weight to which he gave these non-examining physicians' opinions. Rather, the ALJ provided a substantial discussion of other record evidence under his mental RFC finding, and the Court finds that the ALJ's mental RFC finding certainly did not turn on the weight assigned to the opinions of the state agency reviewing consultants. Where an RFC determination is otherwise based on substantial

---

[11] Plaintiff does not list this claim of error in the "issues presented" section at the outset of his brief, and his argument is merely one paragraph long. *See* Pl. Br. at 1, 24–25.

evidence, it is not necessarily reversible error to draw inferences from a physician's silence. *See Clyburn v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 892, 894 (11th Cir. 2014).

In any event, the Court recommends reversal of the Commissioner's decision under Plaintiff's first claim of error, and the ALJ will have the opportunity on remand to correct any improper weight given to opinions of record that are silent as to the issues and/or subject to competing inferences. *See id.* (citing *Lamb*, 847 F. 2d at 703).

## V.   CONCLUSION

For the reasons discussed above, the undersigned **RECOMMENDS** that the decision of the Commissioner be **REVERSED and REMANDED** to the Commissioner for further action consistent with this opinion. **IT IS FURTHER RECOMMENDED** that judgment be entered in favor of Plaintiff.

**IT IS FURTHER RECOMMENDED** that, in the event that past-due benefits are awarded to Plaintiff upon remand, Plaintiff's attorney may file a motion for approval of attorney's fees under 42 U.S.C. §§ 406(b) and 1383(d)(2) no later than thirty (30) days after the date of the Social Security letter sent to Plaintiff's counsel of record at the conclusion of the Agency's past-due benefit calculation stating the amount withheld for attorney's fees. Defendant's response, if any, shall

be filed no later than thirty (30) days after service of the motion, and Plaintiff shall file any reply within fourteen (14) days of service of Defendant's response.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 10th day of July, 2018.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE